UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

WENDY KAY HONAKER,
    Plaintiff,

Case No. 1:13-cv-669
Barrett, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

REPORT AND
RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application for supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 7), the Commissioner's response in opposition (Doc. 12), and plaintiff's reply memorandum (Doc. 13).

**I. Procedural Background**

Plaintiff filed an application for SSI on August 19, 2010, alleging disability since March 1, 2007, due to mental retardation, depression and anxiety. Plaintiff's application was denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing before ALJ Gregory G. Kenyon. Plaintiff and a vocational expert (VE) appeared and testified at the ALJ hearing. On May 23, 2012, ALJ Kenyon issued a decision denying plaintiff's SSI application. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the

2

relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] has not engaged in substantial gainful activity since August 19, 2010, the application date (20 CFR 416.971 *et seq.*).
>
> 2. The [plaintiff] has the following severe impairments: depression, an anxiety disorder, borderline intellectual functioning, a personality disorder not otherwise specified, and a history of polysubstance abuse (20 CFR 416.920(c)).
>
> 3. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: (1) no climbing of ladders, ropes, or scaffolds; (2) no work around hazards such as unprotected heights or dangerous machinery; (3) no driving of automotive equipment; (4) limited to performing unskilled, simple, repetitive tasks; (5) limited to occasional brief superficial contact with co-workers and supervisors; (6) no public contact; (7) no jobs involving teamwork or tandem tasks; (8) no jobs involving rapid production pace work or strict production quotas; (9) limited to performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work setting from one day to the next; and (10) no jobs involving reading, writing or math.
>
> 5. The [plaintiff] is unable to perform any past relevant work[1] (20 CFR 416.965).
>
> 6. The [plaintiff] was born [in] . . . 1971 and was 39 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

---

[1]Plaintiff has past relevant work as a motel housekeeper, retail cashier, gas station cashier, and nursing home housekeeper. (Tr. 17).

3

7. The [plaintiff] has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 416.969 and 416.969(a)).

10. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since August 19, 2010, the date the application was filed (20 CFR 416.920(g)).

(Tr. 10-18).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson,* 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff asserts two assignments of error: (1) the ALJ erred by failing to appropriately evaluate evidence of plaintiff's deficits in adaptive functioning under Listing 12.05 for intellectual disability; and (2) the ALJ erred by failing to consider evidence that plaintiff's deficits in adaptive functioning manifested during the developmental period. Plaintiff argues that as a result of the ALJ's failure to properly evaluate the evidence, the ALJ's decision that plaintiff's severe mental impairment does not satisfy either Listing 12.05(B) or 12.05(C) for "mental retardation"[2] is incorrect and contrary to law. Because plaintiff's assignments of errors are closely related, the Court will consider them together.

#### 1. Listing 12.05

Listing 12.05 contains an introductory paragraph with the diagnostic description of "intellectual disability" and four sets of criteria set forth in paragraphs (A)-(D). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. If an individual's intellectual disability satisfies the diagnostic description in the introductory paragraph and any of the four sets of criteria set forth in Listing

---

[2]The parties and the ALJ refer to "mental retardation," but Listing 12.05 now uses the term "intellectual disability." Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

5

12.05(A)-(D), then the individual's impairment will be found to meet the Listing. *Id*. The introductory paragraph defines "intellectual disability" as follows:

> [I]ntellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

*Id*. Thus, to satisfy Listing 12.05, the claimant must introduce evidence that she experienced deficiencies in adaptive functioning and that such deficiencies arose during the developmental period. *West v. Com'r Soc. Sec. Admin.*, 240 F. App'x 692, 698 (6th Cir. 2007) (citing *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *Carmack v. Barnhart*, 147 F. App'x 557, 560-61 (6th Cir. 2005)). "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *Id*. (citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993)). *See also Hayes v. Comm'r of Soc. Sec.*, 357 F. App'x 672, 677 (6th Cir. 2009) ("The American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'") (quoting Diagnostic and Statistical Manual of Mental Disorders, p. 49 (4th ed. 2000)).

Paragraph B requires a "valid verbal, performance, or full scale IQ of 59 or less[.]" 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(B). Paragraph C requires the following criteria:

> A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(C). A claimant must therefore make three showings to satisfy Listing 12.05(C): (1) she "experiences 'significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested during the

6

developmental period' (*i.e.*, the diagnostic description)"; (2) she has a "valid verbal, performance, or full scale IQ of 60 through 70"; and (3) she suffers from "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *West*, 240 F. App'x at 697-98 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C); *Foster*, 279 F.3d at 354-55; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)).

### 2. Medical evidence related to plaintiff's intellectual disability

In 2000, Dr. Timothy Jetta, M.D., examined plaintiff on a referral by the Department of Human Services for severe panic attacks and depression. (Tr. 301-04). Dr. Jetta diagnosed plaintiff with major depressive disorder, post-traumatic stress disorder, panic disorder with agoraphobia, obsessive compulsive disorder (provisional), reading disorder, mathematics disorder, and borderline traits. (Tr. 303). He assigned a GAF score of 55.[3] (*Id.*).

In 2004, plaintiff was referred to Dr. Sandra Elliott, Ph.D., for a psychological and parenting evaluation due to a history of failing to provide for her children's basic needs. (Tr. 292-300). Dr. Elliott diagnosed plaintiff with a dysthymic disorder, generalized anxiety disorder, social phobia, panic disorder without agoraphobia-rule out, and alcohol abuse-rule out. (Tr. 298). Dr. Elliott administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III) and reported the following IQ scores: Verbal- 70, Performance- 55, and Full-Scale- 61. (Tr. 297). Dr. Elliott assessed plaintiff's functioning in the mild mentally retarded range and

---

[3] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id*. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 34. The DSM-IV categorizes individuals with scores of 51-60 as having "moderate" symptoms. *Id*.

diagnosed her with a learning disorder NOS. (Tr. 298). Dr. Elliott assigned plaintiff a GAF score of 40, "Major impairment in areas such as work, judgment, thinking or mood."[4]

Plaintiff underwent examinations by three consultative examining psychologists in connection with her SSI application. Consultative examining psychologist Dr. George Lester, Psy.D., examined plaintiff on January 25, 2010, and interpreted WAIS-IV test results administered in conjunction with his examination. (Tr. 257-65). He reported the following IQ scores: Verbal Comprehension - 63; Perceptual Reasoning - 56; Working Memory - 58; Processing Speed - 59; and Full-Scale IQ - 53. (Tr. 261). Dr. Lester opined these IQ scores were a "low estimate of [plaintiff's] actual functioning" and that plaintiff was "likely functioning within the borderline range." (*Id.*). Dr. Lester opined that plaintiff's mental ability to relate to others, including fellow workers and supervisors, is likely to be moderately impaired by her depression and anxiety symptoms and her "estimated borderline intellect"; her mental ability to understand, remember and follow instructions is moderately impaired by her estimated borderline intellect; her mental ability to maintain attention, concentration, persistence and pace to perform routine tasks is moderately impaired; and her mental ability to withstand the stress and pressure associated with day to day work activity is moderately impaired. (Tr. 262-63).

Consultative examining psychologist Dr. Richard E. Sexton, Ph.D., examined plaintiff on October 22, 2010. (Tr. 284-289). He noted that plaintiff completed the equivalent of ninth grade and that she had attended both regular and special education classes for learning disabled students. (Tr. 284). He observed no abnormalities in her appearance or flow of conversation and thought. (Tr. 285). He opined that her hypothetical judgment appeared to be "fair and somewhat erratic." (Tr. 286). He noted that her past jobs consisted of housekeeping and cashier positions.

---

[4] The DSM-IV categorizes an individual with a GAF score of 31-40 as having "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood[.]" DSM IV, p. 34.

8

(Tr. 285). He determined she could do simple math. (Tr. 287). Dr. Sexton opined that plaintiff appeared capable of performing personal activities of daily living, and he stated that she indicated she is able to do "some cooking, cleaning, laundry, and grocery shopping as well." (*Id.*). He described plaintiff's level of intelligence as falling at the upper end of the borderline range. (*Id.*). He opined that plaintiff appeared to be suffering from a longstanding depressive disorder and an anxiety disorder not otherwise specified. (Tr. 288). He noted that in terms of functioning, plaintiff acknowledged having a peer support group but she did not socialize very often, and she spent most days in her residence doing chores, playing with her grandchildren, listening to music or watching television, and going out occasionally. (*Id.*). Dr. Sexton assigned a GAF score of 64.[5] (*Id.*). Dr. Sexton opined that plaintiff has only mild limitations in her ability to relate to others; understand, recall and carry out simple instructions; maintain attention, concentration, persistence and pace to perform routine work activities; and withstand the stress and pressure associated with day-to-day work activity. (Tr. 289).

Consultative examining psychologist Dr. Brian R. Griffiths, Psy.D., examined plaintiff on February 6, 2012. (Tr. 314-320). He noted that she had worked as a housekeeper and a cashier and she reported she was terminated as a cashier at Deals after two months for "miscalculation" of money. (Tr. 316). Plaintiff reported that she spent her time playing with her granddaughter and watching television. (Tr. 316-17). She stated she can attend to her own grooming and hygiene but often neglects to do so because of lack of energy; she can do household chores but often lacks the motivation to perform them; and she can fix a meal, grocery shop, count money and pay bills. (Tr. 317). Dr. Griffiths reported that plaintiff's grooming and hygiene were adequate, but she appeared to be anxious, depressed, and intellectually limited. (*Id.*). Dr.

---

[5] The DSM-IV categorizes individuals with scores of 61-70 as having "some mild symptoms" or "some difficulty in social, occupational or school functioning . . . but generally functioning pretty well. . . ." DSM-IV, p. 34.

9

Griffiths opined that her complaints of limited energy and easy fatigability might be indicative of somatization. (Id.). Dr. Griffiths diagnosed plaintiff with major depressive disorder, recurrent; moderate panic disorder without agoraphobia; and borderline intellectual functioning. (Tr. 318). Dr. Griffiths assigned a GAF score of 51, "Moderate Symptomatology." (*Id.*). He opined that although her "arithmetic reasoning skills were not strong during this evaluation, she very likely can manage funds." (*Id.*).

### 3. The ALJ did not err by finding that plaintiff's severe mental impairment does not meet or equal Listing 12.05.

Plaintiff argues that the ALJ erred by finding that her severe mental impairment does not meet Listing 12.05(B) and (C) because (1) the evidence shows she has a valid IQ score that satisfies the Listing, together with deficits in adaptive functioning, and (2) the evidence shows the deficits in adaptive functioning had their onset during the developmental period (prior to age 22). (Doc. 7). Plaintiff specifically alleges she has met her burden of showing she has a valid and credible IQ score that satisfies the requirements of both Listing 12.05(B) and (C); she has been diagnosed with "mental retardation"; she has a history of deficits in adaptive functioning which is medically consistent with mental retardation; and her history of deficits in adaptive functioning is documented by records generated within three years of the end of the developmental period. Plaintiff further alleges that she suffers from additional severe mental impairments of depression and anxiety so as to satisfy Listing 12.05(C).

#### a. Required IQ score under Listing 12.05(B)

The ALJ found that Listing 12.05(B) is not met because plaintiff does not have a valid verbal, performance or full-scale IQ score of 59 or less and plaintiff "has obvious borderline intellectual functioning but is not mentally retarded." (Tr. 12). In making these findings, the ALJ acknowledged two sets of IQ test results: (1) the WAIS-IV test results reported by Dr.

10

Lester in 2010, and (2) the WAIS-III test results reported by Dr. Elliott in 2004. (*Id.*, citing Tr. 291-300). The ALJ acknowledged that plaintiff's "IQ scores are indicative of mental retardation[.]" (Tr. 12). However, the ALJ noted that Dr. Lester found the scores he reported to be a "low estimate of [plaintiff's] actual functioning" and that Dr. Lester diagnosed "borderline intellectual functioning," not mental retardation. (*Id.*, citing Tr. 257-65). The ALJ concluded that plaintiff functioned in the borderline range of intelligence despite her low IQ scores. (Tr. 12).

Substantial evidence supports the ALJ's decision to reject the reported IQ scores of 59 or less as invalid and the ALJ's finding that plaintiff's intellectual disability does not meet Listing 12.05(B). In rejecting the low IQ test scores as invalid, the ALJ reasonably relied on Dr. Lester's expert opinion that the test scores were a "low estimate" of plaintiff's actual functioning. (Tr. 262). Plaintiff challenges the ALJ's reliance on Dr. Lester's opinion because she contends Dr. Lester discounted the IQ scores based primarily on her self-reported work history, which plaintiff alleges she inaccurately conveyed due to her mental deficiencies. (Doc. 7 at 4; Doc. 13 at 5, citing Tr. 259-62). However, plaintiff has not produced any evidence to show that her borderline intellectual functioning precluded her from providing reliable information regarding her work history or other facets of her personal life at the consultative examination. Further, Dr. Lester's report shows that plaintiff's work history was only one factor he considered in finding plaintiff was functioning at a higher level than her IQ scores reflected. Dr. Lester expressly stated that he also took into account plaintiff's presentation at the examination and her use of vocabulary, and he gave no indication that he weighted any one factor more heavily than another. (Tr. 262). Moreover, Dr. Lester's report indicates that he was aware that plaintiff had held only a handful of jobs for brief periods of time and that she had lost

11

some of these jobs due to her inability to meet the mental demands of the jobs. Dr. Lester notes in his report that plaintiff had lost her most recent job as a housekeeper at Days Inn in 2009, which she had held for about one month, because of "slow work performance"; she had been fired from her previous job at BP, which she had held for two months, because she "miscounted the money in [her] drawer"; and her only other two jobs consisted of some housekeeping for her mother in 1993 and working at Deals doing stock work and cashiering for one and one-half years, which had been her longest job and which she quit because she "got the shakes when [she] lifted stuff sometimes." (Tr. 259). Thus, assuming, *arguendo*, that plaintiff had worked at Deals (or Dollar Tree) for only three months as she now asserts her earnings records show (Doc. 7 at 4, citing Tr. 168, 177), there is no indication in the record that Dr. Lester would have reached a different conclusion regarding her actual level of functioning based on this information. Dr. Lester's opinion supports a finding that plaintiff's reported IQ scores are not valid.

Further, as discussed below, the ALJ's finding that plaintiff's IQ scores of 59 or below are not valid is supported by the evidence of record showing that her level of adaptive functioning exceeds that of a "mentally retarded" individual. (Tr. 12). This evidence, considered in conjunction with Dr. Lester's expert opinion that plaintiff's IQ scores were a "low estimate" of plaintiff's actual functioning, substantially supports the ALJ's decision to reject plaintiff's IQ scores of 59 or below as invalid. The ALJ's finding that Listing 12.05(B) is not satisfied because plaintiff does not have a qualifying IQ score of 59 or below should be upheld.

### b. Deficits in adaptive functioning

Even assuming the IQ scores of 59 or below as reported in the record were valid, "the mere fact of a qualifying IQ score does not require that the ALJ find mental retardation under Section 12.05B when substantial evidence supports the contrary conclusion or the claimant's

allegations of her capabilities are deemed not credible." *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 721 (6th Cir. 2012) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 543 (6th Cir. 2007)). Here, the ALJ found that "[w]hile [plaintiff's] IQ scores are indicative of mental retardation, her level of adaptive functioning is well above that of a mentally retarded individual" so that plaintiff's mental impairment does not meet or equal Listing 12.05. (Tr. 12). The ALJ further found that Listing 12.05(C) is not met because although plaintiff has depression and anxiety, as well as IQ scores falling between 60 and 70, her "level of adaptive functioning does not show deficits consistent with mental retardation" (*Id.*). Substantial evidence consisting of plaintiff's testimony and the medical opinion evidence of record supports the ALJ's findings.

In finding that plaintiff's level of adaptive functioning is "well above that of a 'mentally retarded' individual," the ALJ acknowledged that plaintiff lives with her daughter but found she is able to care for her own daily needs; she is able to perform household chores such as cooking, cleaning, laundry and grocery shopping; she enjoys playing with her granddaughter, knitting and bingo; and she performed some semi-skilled work as a storage facility cashier. (*Id.*). Plaintiff challenges the ALJ's portrayal of her abilities as inaccurate and contends that her testimony and an April 2010 Function Report (Tr. 198-205) show she has difficulties with daily activities such as cooking, household chores, grocery shopping and paying bills and that, according to her daughter, she lacks the judgment necessary to watch her granddaughter unsupervised for a significant period of time. (Doc. 7 at 3-4, citing Tr. 35, 44, 46-47, 48, 57, 72-73, 201). However, although plaintiff testified to some difficulty with activities of daily living consistent with her borderline intellectual functioning, there is no indication the ALJ inaccurately portrayed her capabilities. Rather, plaintiff testified at the ALJ hearing that she is able to take care of her own personal needs. (Tr. 40). She also testified that on a typical day she gets up in the morning,

13

makes coffee, and watches the news, which she is able to understand for the most part. (Tr. 44, 52). Plaintiff testified that she performs household chores including cleaning, mopping and sweeping, although sometimes she must redo a task which has not completed to her daughter's satisfaction. (Tr. 44, 48). She testified that her daughter does all of the cooking but that plaintiff can cook simple things such as Ramen noodles, eggs, and spaghetti. (Tr. 44, 49). Plaintiff testified that she is able to count change, although she has difficulty with mathematical calculations. (Tr. 37; *see also* Tr. 202). The ALJ did not err by relying on this testimony to find that plaintiff's level of adaptive functioning exceeds that of a "mentally retarded" or intellectually disabled individual. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(C)(1) (listing adaptive activities of daily living as including "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [one's] grooming and hygiene, using telephones and directories, and using a post office").

Further, independent of plaintiff's testimony, the medical opinion evidence provides substantial support for the ALJ's finding that plaintiff does not experience deficits in adaptive functioning. In assessing plaintiff's level of mental functioning, each of the three consultative examining psychologists considered plaintiff's report of her daily activities as well as her presentation at the examinations. (Tr. 257-64, 284-89, 314-20).[6] All three of these psychological experts opined that plaintiff was functioning in the "borderline" intellectual range and assessed only mild to moderate work-related mental limitations. (*Id.*). In addition, Dr. Jetta, who examined plaintiff on a referral from the Department of Human Services in October

---

[6] Plaintiff alleges the ALJ should not have relied on the report of Dr. Griffiths who "found [plaintiff] to be intellectually limited but relied on the claimant's report of working as a cashier for B.P. for eight months to conclude that she was not mentally retarded." (Doc. 13 at 5, citing Tr. 319). Contrary to plaintiff's argument, Dr. Griffiths did not rely on plaintiff's work history to conclude she functioned in the borderline range of intelligence. Rather, his opinion in this regard was based on her ability to follow simple instructions during the evaluation and her performance on psychological testing. (Tr. 319).

2000, assessed "Borderline traits" on Axis III, and not mental retardation. (Tr. 303). The only contrary medical opinion in the medical record is from the 2004 opinion of Dr. Elliott, who assessed plaintiff's functioning in the mild mentally retarded range. (Tr. 298). It is the ALJ's function to resolve conflicts in the medical evidence. *Chandler v. Comm'r of Soc. Sec.*, 124 F. App'x 355, 358 (6th Cir. 2005) (citing *Richardson*, 402 U.S. at 399). Given the weight of the psychological evidence and plaintiff's testimony at the hearing and reports of functioning, the ALJ reasonably credited the expert medical opinions of the consultative examining psychologists over the 2004 assessment of Dr. Elliott. (Tr. 16-17). The psychological experts' opinions provide substantial support for the ALJ's finding that plaintiff does not demonstrate deficits in adaptive functioning as required under Listing 12.05 and that plaintiff's intellectual disability does not meet or equal Listing 12.05. *See West*, 240 F. App'x at 698-99 (medical evidence indicated that the plaintiff did not exhibit deficiencies in adaptive functioning and supported the ALJ's conclusion that the plaintiff did not meet or equal Listing 12.05(C) where examining psychologists did not diagnose the plaintiff with any form of mental retardation; one report revealed only borderline intellectual functioning, not mental retardation; and the plaintiff was assessed as able to follow simple instructions and perform basic work tasks).

Thus, viewed as a whole, substantial evidence supports the ALJ's finding that plaintiff does not experience deficits in adaptive functioning as required under Listing 12.05. The ALJ's finding that plaintiff does not have deficits in adaptive functioning which satisfy Listing 12.05 should be upheld.

   c. **Deficits in adaptive functioning prior to age 22**

Even assuming plaintiff suffers from deficits in adaptive functioning, substantial evidence supports the ALJ's finding that the record does not document the existence of

significant deficits in adaptive functioning prior to age 22. (Tr. 12). Plaintiff contends that the ALJ erroneously relied on her failure to present records prior to age 22 to conclude she could not be found disabled under Listing 12.05. (Doc. 7 at 13). Plaintiff alleges "it is clear that [she] has deficits in intellectual functioning consistent with a diagnosis of mild mental retardation and these have been present since age 25" (*Id*. at 14), which she acknowledges is the earliest age for which records of her functioning are available. (*Id*. at 2, citing Tr. 305-12). Plaintiff contends that pursuant to Sixth Circuit law, a claimant is not required to produce a qualifying IQ score obtained before age 22 to demonstrate that her subaverage intellectual functioning initially manifested during the developmental period. (*Id*. at 13, citing *West*, 240 F. App'x at 698). Plaintiff further contends that the regulations do not require proof of deficits in adaptive functioning prior to age 22 in order to satisfy Listing 12.05.[7] (Doc. 13 at 8).

Contrary to plaintiff's position, under Sixth Circuit case law plaintiff has the burden to produce proof that subaverage intellectual functioning with deficits in adaptive functioning manifested before age 22 in order to satisfy Listing 12.05. *See Daniels*, 70 F. App'x at 873 (finding that the plaintiff had not provided "any evidence, as required, that her mental deficiency initially manifested before age 22.") (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05); *West*, 240 F. App'x at 698 (affirming the ALJ's decision that Listing 12.05 was not met because the plaintiff "introduced absolutely no evidence that he experienced deficiencies at all in 'adaptive functioning,' let alone that any such deficiencies arose during the developmental period.") (citing *Foster*, 279 F.3d at 355; *Carmack*, 147 F. App'x at 560-61). Plaintiff has not directed the Court

---

[7] Plaintiff cites *Brown v. Sec'y of HHS*, 948 F.2d 268, 270 (6th Cir. 1971), for the proposition that the Sixth Circuit has recognized that intellectual disability proven by test scores after age 22 may be the basis for a finding that Listing 12.05 is met. (Doc. 7 at 13). The Court in *Brown* held that the ALJ's rejection of the plaintiff's IQ score obtained after age 22 was not substantially supported; however, the Court recognized its decision did not conclude the matter and remanded for further administrative proceedings on the issue of whether the plaintiff's mental impairment manifested during the developmental period or was partially the consequence of his heavy drinking after age 22. (*Id*. at 270-71).

to any evidence that shows she experienced deficiencies in "adaptive functioning" during the developmental period. To the contrary, plaintiff acknowledges that the earliest records related to her functioning date from 1997, which is three years past the developmental period. (Doc. 7 at 2). Plaintiff generally alleges that she attended special education classes, but this broad allegation, standing alone, is insufficient to establish that she experienced deficits in social skills, communication, or daily living skills prior to age 22. Plaintiff has therefore failed to establish this required element of Listing 12.05, and the ALJ's decision should be upheld on this additional ground.

### III. Conclusion

Substantial evidence supports the ALJ's finding that plaintiff's intellectual disability does not meet or equal Listing 12.05(B) or 12.05(C) because (1) plaintiff does not have a valid IQ score of 59 or below so as to satisfy Listing 12.05(B); (2) plaintiff does not experience deficits in adaptive functioning which satisfy Listing 12.05; and (3) there is no evidence of deficits in adaptive functioning which initially manifested before age 22. Plaintiff's assignments of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: 8/13/14

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

WENDY KAY HONAKER,
    Plaintiff,

Case No. 1:13-cv-669
Barrett, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).